UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------X
JOHAN GUNAWAN,
ARBIGO INC., and
SUPERNOVA ADVERTISING INC.
dba MSYMMETRY

|  |  |
|---|---|
| Plaintiffs, | **BENCH TRIAL REQUESTED** |
| - against - | Civil Case No. 26-cv-1056 (    ) |
| STEPHEN JOHNSTON, SR.,
STEPHEN JOHNSTON, JR., and
PUBWISE, LLLP |  |
| Defendants. | **VERIFIED COMPLAINT** |

----------------------------------------------X

Plaintiffs, by their attorney, for their verified complaint, allege as follows:

## PARTIES

1.      Plaintiff Johan Gunawan ("Gunawan") is a domiciliary and citizen of the State of Pennsylvania and resides in the City of Philadelphia and he is the founder and Chief Executive Officer of Arbigo Group Companies.

2.      Plaintiff Arbigo Inc. ("Arbigo") is a New York corporation and certified minority owned business in New York City.

3.      Plaintiff Supernova Advertising Inc., dba MSymmetry, is a Florida Corporation, (collectively, sometimes referred to as "Arbigo Group Companies" and together with Gunawan, sometimes collectively referred to as "Plaintiffs").

4.      Defendant PubWise, LLLP ("Pubwise") is a Georgia company operating out of the city of Atlanta, Georgia.

5.      Defendant Stephen Johnston, Sr. is the Chairman and Chief Executive Officer of Pubwise and resides in the State of Georgia.

6.      Defendant Stephen Johnston, Jr. is the Founder and Chief Technology Officer of Pubwise and resides in the State of Georgia (individual defendants are collectively sometimes hereinafter referred to as "Johnston Defendants," Johnston, Sr." and "Johnston Jr.," as the case may be).

## JURISDICTION

7.      This Court has *in personam* jurisdiction over the Johnston Defendants and Pubwise because the defendants conducted business in the State of New York and further entered into a mutual master services agreement ("MSA") where the parties agreed to the exclusive jurisdiction of the courts of New York.

8.      Federal subject matter jurisdiction exists under 28 U.S.C. §1332(a) because complete diversity of citizenship exists among adverse parties and the monetary relief sought and the value of the non-monetary relief sought each exceed $75,000.

9.      Venue is proper under 28 U.S.C. §1391(a)(1) in this District since Arbigo Inc. is a New York corporation and a certified minority owned business in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in the State of New York.

## NATURE OF THIS ACTION

10.      This lawsuit seeks to redress past and continuing injuries inflicted upon Plaintiffs by the Johnston Defendants that, under New York law, constitute acts of breach of contract (Count I), and fraud in the inducement (Count II). This wrongful and intentional conduct

2

perpetrated by the Johnston Defendants aimed at Plaintiffs over the years has caused and
continues to cause the Arbigo Group Companies and Gunawan, individually, as set forth in detail
herein, irreparable harm and ongoing personal and professional reputational injury to the Arbigo
Group Companies and Gunawan, individually in the ad tech industry.

11.     As detailed herein Johnston, Sr. does not dispute the fact that the MSA was
violated by Pubwise. In fact, Johnston, Sr. freely admits to Gunawan that Pubwise is in default
under the MSA. This evidence is undisputedly established in the form of several emails and
multiple texts issued by Johnston, Sr. to Gunawan. Critically, to further intentionally trick and
deceive Gunawan, Johnston, Sr. over the years (with the assistance and encouragement of
Johnston Jr.) made multiple false promises and representations to remit the outstanding accounts
receivable ("AR") of $232,367.12 to Arbigo Inc., not including interest. As a result of non-
payment, Arbigo Inc. was unable to satisfy its $121,110.38 obligation to Google Inc. ("Google")
a critical supply side relationship of Plaintiffs not including interest. Google suspended its
relationship with Arbigo Inc.

12.     As further detailed herein, following the breach of the MSA, Johnston, Sr. (with
the knowledge, encouragement and acquiescence of Johnston Jr.) took it a step further by
engaging in a separate and distinct pattern of blatant and intentional wrongful behavior by,
among other illicit and wrongful acts, fraudulently inducing or "luring" Gunawan with multiple
false promises independent of any contractual obligations to continue operating under false
pretenses of imminent payment. Johnston, Sr. encouraged Gunawan to seek financing to bridge
the gap until Pubwise paid for its outstanding obligations. Gunawan secured a $100,000 loan
from ODK Capital, LLC at an annual interest rate of 49.94%, resulting in interest payments

3

alone exceeding $4,000 per month. Johnston, Sr. and Gunawan had an express understanding that this high-interest loan would be short-term—only for a few months—until Pubwise paid its outstanding obligations in full. Johnston, Sr. falsely promised Gunawan that he would assist with the repayment of the loan and the associated interest. Gunawan, based upon Johnston Sr.'s promises, relied on these fraudulent misrepresentations of present fact and incurred this substantial debt. When Pubwise failed to pay as Johnston, Sr. had promised, Gunawan was forced to refinance the ODK Capital loan through TD Bank, obtaining a $100,000 loan and a $50,000 line of credit. The loans, however, did not cover all outstanding defaults, resulting in Gunawan losing coveted publishing relationships that took years to cultivate and leaving him with demand notices and threats of litigation from supply-side partners with which he once was in good standing.

13.    In truth, as detailed herein, Johnston, Sr., despite multiple promises to assist with the repayment of the loans and the associated high interest against the loans, made only a few sporadic interest payments and then abruptly ceased making further payments. In fact, Johnston, Sr. had no intention of assisting Gunawan with these loans and high-interest payments. Instead, this was a premeditated stratagem by the Johnston Defendants in furtherance of their fraudulent scheme to misappropriate and use monies for their own personal benefit due to the Arbigo Group Companies and supply-side partners. This scheme cost Gunawan his professional reputation and a business that he spent over fourteen years building, which is now on the precipice of bankruptcy. This pattern of fraudulent events exacted upon Gunawan has caused, and continues to cause, catastrophic professional, reputational, and financial harm, including the destruction of Plaintiffs' business, loss of industry standing, and loss of livelihood.

4

## STATEMENT OF FACTS

14.    By way of background, the Arbigo Group Companies operate an ad tech exchange with a proprietary real-time bidding technology (RTB) that integrates with demand side platform (DSP) and supply side platform (SSP) partners. The Arbigo Group Companies' advertising infrastructure is proprietary technology built in-house. Supernova offers neuroscience-driven marketing research and media buying solutions (DSP) for advertisers, brands, and agencies. The neuroscience approach is Supernova's key differentiator to compete with large enterprises such as Nielsen.com Score, The Trade Desk, and Google Ads to name a few. MSymmetry (a dba of Supernova) represents Supernova's supply side platform, and its purpose is to attract publisher relationships and supply intermediaries. Supernova and MSymmetry are wholly owned and controlled by Gunawan, and Gunawan is the sole owner of the business.

15.    For illustrative purposes, an 'ad exchange' conducts automated auctions of publisher display ad inventory, with winning auctions resulting in the showing of an ad on a given ad placement known as an impression.

16.    Website owners (publishers) use ad servers to store ads, decide which ads to appear on various parts of their sites, and track how well they perform – *e.g.,* counting clicks. Supply side platforms (SSPs) run auctions automatically, connect publishers to advertisers, and help publishers maximize ad revenue.

17.    On the demand side, advertisers and media agencies manage advertising campaigns for businesses seeking to reach customers. These advertisers rely on specialized ad-buying tools to store creative assets, deliver them to publishers, and track campaign results.

Larger advertisers and media agencies typically employ sophisticated demand-side platforms that enable them to participate in real-time bidding auctions across multiple publishers and exchanges simultaneously. DSPs enables advertisers to select which website visitors see their ads based on information like their search history, prior visits to other websites, and location, age and gender.

18.    Pubwise is an ad tech company that prides itself on a proprietary real-time bidding platform ("RTB"), which is a platform for programmatic buying. In a fraction of a second, RTB allows website publishers to sell available advertising space belonging to publishers. Within milliseconds, the bid request is valued by DSPs participating in various exchanges. On behalf of advertisers, the DSPs, (here Pubwise), provide a bid for the ad exchanges and the SSP, in this case the Arbigo Group Companies. Ad exchanges charge publishers a share of the transaction value, known as a "take rate" to facilitate RTB transactions, which ranges from 5 to 20 percent (or more) of the clearing price, i.e., the price where the publisher and advertiser meet.

19.    Here, during the relevant period in question, the Arbigo Group Companies served as the SSP and Pubwise functioned as the DSP. To that end, the Arbigo Group Companies and Pubwise entered into the MSA on December 11, 2020. A true and correct copy of the MSA is attached as **<u>Exhibit A</u>**.

## ALLEGATIONS RELATING TO THE BREACH OF CONTRACT CLAIM

**A.  Pubwise's breach of the MSA**

20.     As noted herein, the Arbigo Group Companies and Pubwise signed an MSA on December 11, 2020.

21.     Arbigo lost two major publisher accounts directly caused by Pubwise's delayed payment on one account; specifically, LoopMe, a U.K. based company, and Pubwise's outright default with publisher Google, Inc. constituting a material violation under the MSA.

### 1.  The value and loss of the LoopMe account caused by Defendants MSA violation.

22.     LoopMe entered an Order Form Agreement ("Agreement") on November 7, 2022, with Arbigo's wholly owned subsidiary MSymmetry. It is worth noting that the ad tech industry is highly relationship driven and LoopMe is no exception, being extremely diligent when it comes to partnering with ad tech companies. A true and correct copy of the Agreement is attached as **Exhibit B**.

23.     To secure this account, Gunawan structured MSymmetry as a supply side (SSP) arm of Supernova, with Arbigo serving as the hub for all SSP and DSP activity.

24.     LoopMe partnerships are granted only to entities such as Plaintiffs that can demonstrate proven advertiser demand for LoopMe's vast publisher network.

25.     For Plaintiffs, securing the LoopMe account required three years of effort including chasing leads, seeking introductions through credible third parties, and relentless attempts to secure a meeting with the organization. This LoopMe opportunity materialized through rare alignment and timing; specifically, a U.S. contact that referred Gunawan to a U.K. business development lead, which resulted in the relationship between both entities.

7

26.    To support this opportunity, Gunawan spent substantial time and effort structuring his business divisions; specifically, using MSymmetry as a supply-side arm of Supernova with the Arbigo Group Companies serving as the technical backbone. LoopMe became an important partner of an integrated business model linking Supernova (DSP), MSymmetry (SSP), and the Arbigo Group Companies (technology backbone). In short, LoopMe became a critical relationship from a revenue and reputational standpoint for Plaintiffs in the ad tech sector to become a respected organization.

27.    In addition, the value of the LoopMe relationship beyond the revenue generated by the Arbigo Group Companies was tremendous.

28.    In particular, LoopMe provided far more than merely revenue to Arbigo (averaging $23,332.26 per month with approximately 19% profit margins) including deliverables such as (i) direct access to premium publisher inventory, (ii) third-party validation of Supernova as a credible demand side partner, (iii) a cornerstone for the Arbigo / Supernova / MSymmetry ad-tech model, (iv) a long-term strategy for a DSP strategy, and (v) a unique publisher (SSP) that created independence and competitive advantage for the Arbigo Group Companies.

**2.    The damages sustained by Arbigo and its companies by the loss of LoopMe.**

29.    "LoopMe issued a formal demand letter on October 19, 2023—only 12 months into the relationship—demanding immediate payment of $166,242.71 in outstanding invoices spanning January through September 2023. The Arbigo Group Companies were unable to timely pay LoopMe, because Pubwise failed to, timely, make payments to Arbigo for services rendered on behalf of Pubwise during this same period.

30.     In its demand letter, LoopMe wrote: 'Due to your continuous failure to pay fees which are due in a timely fashion, this letter serves as notice that you are currently in breach of the Agreement.' Following the demand letter, as Pubwise made partial payments to Arbigo, Arbigo immediately forwarded those funds to LoopMe. Between November 2, 2023 and December 8, 2023, Pubwise paid Arbigo $156,121.00. Because Pubwise's payments were insufficient to cover the full LoopMe demand of $166,242.71, Arbigo was forced to pay $10,121.71 out of pocket—funds that Pubwise had not yet remitted—in order to satisfy the demand in full and attempt to preserve the relationship. Arbigo paid the outstanding balance in full by December 8, 2023. Despite receiving full payment, LoopMe declined to continue the business relationship due to the nine months of chronic delinquency caused by Pubwise's non-payment. LoopMe did not respond to subsequent communications from Arbigo. A true and correct copy of the LoopMe demand is attached as **Exhibit C.**

31.     The value of LoopMe account was critical to the Arbigo Group Companies. Specifically, the revenue generated by the Arbigo Group Companies' LoopMe account was substantial. During the active period from November 2022 through October 2023, the account demonstrated consistent performance, with monthly revenue ranging from $6,729.07 to $36,215.52, excluding an exceptional January 2023 peak of $79,030.55. In the six months immediately preceding termination (May 2023 through October 2023), the account generated total revenue of $139,993.58, averaging $23,332.26 per month—reflecting seasonal patterns consistent with digital advertising industry norms. As a direct result of Defendants' non-payment, Arbigo lost the LoopMe account in October 2023. Based on the trailing six-month average revenue of $23,332.26 per month, and applying a two-year business cycle that captures the full

9

seasonal pattern of digital advertising spend, Pubwise's failure to abide by the MSA directly

caused severe foreseeable consequential damages to the Arbigo Group Companies including (i)

$559,974 in lost revenue, (ii) $112,204 in lost profits, (iii) loss of a critical strategic partner that

took years to secure by the Arbigo Group Companies, (iv) loss of credibility in the ad tech

sector, and (v) dissemination of the proprietary integrated structure designed by Gunawan

associated with the Arbigo Group Companies.

**3.   The loss of Google Account and damages to the Arbigo Group Companies directly attributable to Pubwise's breach of the MSA.**

32.     By way of background, Google LLC ("Google") is a dominant player in the ad

tech sector maintaining over 90% of the market share in the publisher ad server market. Google's

AdX is the dominant ad exchange. Google transacts 50-60% of all display advertising

transactions worldwide.

33.     Google was the Arbigo Group Companies largest account and was held under

Arbigo Inc.

34.     Arbigo Inc. secured the Google account in 2012 and was elected as a first-round

beta tester for Google's real-time bidding (RTB) platform - a coveted industry credential. With

Google (and LoopMe), two of the ad tech's most credible supply partners, the Arbigo Group

Companies, were positioned to service suppliers and advertisers generating substantial revenue.

35.     To maintain this coveted account, the Arbigo Group Companies needed to

demonstrate (i) technical and operational reliability, (ii) proven compliance discipline, (iii)

custom data handling and a robust integration network, (iv) a successful completion of a five-

month KPMG audit mandated by Google, and (v) full policy recertification.

10

36.     Google provided the Arbigo Group Companies with access to numerous publishers and other networks within its universe.

37.     The revenue generated by the Arbigo Group Companies' Google account was substantial. As a direct result of Defendants' non-payment, Google account was suspended in March 2024. Based on the trailing six-month average revenue of $46,338.11 per month and applying a two-year business cycle that captures the full seasonal pattern of digital advertising spend, Arbigo has suffered long term damages that include lost revenue of approximately $1,112,115 and lost profits of approximately $556,057.

38.     On March 18, 2024, Google's debt recovery team suspended the Google relationship due to non-payment by Pubwise in violation of the MSA.

39.     At the time Google suspended its relationship, Google was owed $121,110.38. Gunawan was forced to pay this debt—arising from Pubwise's non-payment—from the loan proceeds referenced herein. A true and correct copy of the Google suspension notice is attached hereto as **Exhibit D**.

40.     The suspension of the Google account combined with the LoopMe account termination resulting from Pubwise's material breach of the MSA caused the Arbigo Group Companies to lose annualized revenue potential conservatively estimated at more than $836,045.00 per year.

41.     In short, had Arbigo Group Companies kept the LoopMe and Google accounts, the projected loss of revenue over a two-year period would be more than $1,672,089.00 conservatively.

42. The value of the LoopMe and Google accounts extends far beyond the revenue figures presented herein; rather, the loss of these accounts represents strategic, long-term relationships and credibility in the ad tech ecosystem that are near-impossible to recapture.

43. For example, beyond the loss of revenue resulting from the termination of the Google relationship, the Arbigo Group Companies sustained other damages such as (i) direct access to high quality publisher inventory, (ii) scalable publisher supply required for Supernova's DSP strategy, (iii) a core infrastructure layer of the Arbigo Group Companies ad exchange, and (iv) a foundation for the integrated Supernova/MSymmetry/Arbigo overall strategy.

44. In essence, Google's suspension of this relationship with Arbigo Inc. functionally destroyed the Arbigo Group Companies including, (i) annualized lost revenue ($556,058.00) and annualized lost profit ($278,029.00), (ii) loss of the primary infrastructure for Supernova's direct advertiser strategy and supply pool, (iii) collapse of the Arbigo Group Companies early-adopter advantage from the 2012 BETA program, (iv) destruction of 12 years of compliance (KPMG audit, policy work and engineering), and (v) a "terminal compliance failure" that decimated the Arbigo Group Companies standing and credibility in the ad tech industry.

45. The damage to the Arbigo Group Companies is irreversible, and the reputational harm extends industry wide.

## ALLEGATIONS RELATING TO THE FRAUD CLAIM

**4.  The Fraud in the Inducement exacted upon Gunawan and the Arbigo Group Companies by the Johnston Defendants.**

46.    The Johnston Defendants were not signatories to the MSA. The Chief Revenue Officer executed the MSA on behalf of Pubwise.

47.    Following Pubwise's material violations of the MSA, as described above, Johnston, Sr. independently and subsequent to the material breaches of the MSA, represented in hundreds of texts, several emails and phone conversations with Gunawan that he would assist in paying the outstanding balances that were due and owing to Google and the loan and interest payments.

48.    Upon information and belief, Johnston, Sr. never intended to assist with any repayment to Google nor assist with any loan or interest payments incurred by Gunawan.

49.    Upon information and belief, in particular, Johnston, Sr. never intended to assist with the repayment of the loan that Gunawan obtained from ODK Capital, LLC in the amount of $100,000 at an annual interest rate of 49.94%, with interest payments alone exceeding $4,000 per month. When Pubwise failed to pay as promised, Gunawan was forced to refinance this high-interest loan through TD Bank, obtaining a $100,000 loan and $50,000 line of credit. True and correct copies of the loan agreements are attached hereto as **Exhibit E**.

50.    Johnston, Sr., with the knowledge and encouragement of Johnston Jr., encouraged Gunawan to borrow these funds as a path to make Google current with the express promise that Johnston, Sr. would assist in the repayment of the Google debt and interest and principal payments. In fact, Johnston, Sr. introduced Gunawan to a lender with whom he had a

Case 1:26-cv-01056    Document 1    Filed 02/07/26    Page 14 of 25


pre-existing relationship, encouraging Gunawan to borrow the funds. Specifically, on May 1, 2024, Hanna Kassis, a lender, emailed Gunawan and Johnston, Sr. stating, "Hi guys, we have an offer for $30k. This is the max we can qualify the company for given the cash flows. Let me know if you want to see it. I can get it funded today/tomorrow." Johnston, Sr. replied to the email thread, "Hey Hanna, Please send us the Terms of the offer. Thanks! Stephen Sr." The email thread is attached hereto as **Exhibit F**.

51.     During the period from April 23, 2023, through June 12, 2025, Johnston, Sr., with the knowledge, assistance and encouragement of Johnston, Jr., upon information and belief, issued hundreds of text messages containing false representations of material fact, designed to lure Gunawan into incurring external financing under severe liquidity constraints with multiple other false claims that he was in the process of raising money from various investment groups that would satisfy the outstanding liabilities incurred by the Arbigo Group Companies, while making minimal use of email or other formal business correspondence in connection with such representations.

52.     Johnston Jr. was directly and personally informed of the outstanding debt and its impact by Gunawan. In November 2024 and January 2025, Gunawan sent messages to Johnston Jr. via LinkedIn specifically requesting his assistance in resolving the unpaid balance. Johnston Jr. did not respond to any of these communications. Despite his silence, Johnston Jr. remained publicly active on LinkedIn promoting his business ventures during this same period, demonstrating his awareness of and willingness to benefit from the company's ongoing operations while knowingly ignoring Plaintiffs' requests for payment of amounts due. True and correct copies of these LinkedIn communications are attached hereto as **Exhibit G.**

53.     At all relevant times, the Johnston Defendants were aware that Plaintiffs lacked alternative sources of liquidity and that continued reliance on Defendants' false assurances would foreseeably result in severe and irreversible financial harm.

54.     In addition to these harms, Defendants' conduct foreseeably and materially impaired the enterprise value of the Arbigo Group Companies by undermining their going-concern viability, market credibility, and ability to attract or retain strategic partners.

55.     On November 10, 2023, Johnston, Sr. texted, "Johan, I have one of our investors here meeting to discuss additional funding..." *See* **Exhibit H**.

56.     For example, on December 22, 2023, Johnston, Sr. sent a message to Gunawan stating that, "Hey Johan, I waited to the last-minute hoping for the funds I was promised would come in. They have not…. It is still possible that payment may come this evening and if it does I will let you know." This statement, upon information and belief, was false statement of present fact. *See* **Exhibit I.**

57.     On December 27, 2023, Johnston, Sr. issued another text falsely stating, "Hey Johan …I received a note a few minutes ago that a payment was wired to us today…. I just checked and we have not received anything yet…." *See* **Exhibit J.** On January 16, 2024, Johnston, Sr. texted Gunawan, "…the group we are working with could not get anything done until Friday. I am talking with another group and have sent them our package…." *See* **Exhibit K**.

58.     In January and February 2024 Johnston, Sr. issues via text multiple false statements of present fact suggesting he has investors. For example, on February 28, 2024, Johnston, Sr. texted, "We are with the attorneys right now to work out a quick deal on an investment for us." Upon information and belief, this is a statement of present falsehood

designed to placate Gunawan. *See* **Exhibit L**.

59.     In desperation, Gunawan wrote to Johnston, Sr. on February 2, 2024 "Hi Stephen. I sent the latest billing table via email yesterday. The open amount up to October 2023 is $24,532.13. Including November 2023 is $59,552.25. What is the amount you can send today?" *See* **Exhibit M.** Gunawan, on March 27, 2024, texted Johnston, Sr. stating, "Hi Stephen. Google just sent me an email about escalating the payment situation to the debt recovery team and will soon be passed to a collection agency. I am more concerned about losing the account." *See* **Exhibit N.**

60.     By this point, the Johnston Defendants were expressly aware that Plaintiffs faced imminent loss of a critical supply relationship and catastrophic financial consequences yet continued to issue materially false assurances designed to prolong Plaintiffs' reliance.

61.     On March 28, 2024, Gunawan texted Johnston, Sr. stating, "Hi Stephen. I am trying to manage expectations with Google mainly; in addition to other suppliers; To summarize the billing account; November, December and January are $206,658.43. The amount including February is $245,086.09. The most important amount is with google; we need $160,000. Please let me know what we can do." *See* **Exhibit O.** On April 2, 2024, Gunawan texted Johnston, Sr., stating, "…. The consequence of an additional delay will be quite irreparable. I will try to mitigate the expectation with Google and other supply partners. Are we on track to have the $160,000 by the end of this week?" *See* **Exhibit P.**

62.     On April 3, 2024, Johnston, Sr. texted, "Johan, I have not been successful in getting a firm commitment to funding in the in the next two days. I am in the process of amending our financing package to include more information on being notified that we have

16

been awarded two more patents as of this afternoon….” *See* **Exhibit Q.** On April 25, 2024,

Johnston, Sr. texted Gunawan…. “We should have a response from our investor in the

morning…. I have a call with the overseas group at 9pm tonight….” *See* **Exhibit R.**

63.     In May 2024, Johnston introduced a series of excuses and delays that, upon

information and belief, are false and designed to fraudulently deceive and stonewall Gunawan.

Specifically, he wrote to Gunawan about offering shareholders of Pubwise another investment

opportunity and he takes it further on July 20, 2024, stating to Gunawan that he had “a loan

approved for $250,000 yesterday afternoon, and they killed the deal when I sent information to

our investors. They said that they do not fund companies that have venture capital investors. We

do not but some of are involved with VC firms.” *See* **Exhibit S.** This statement is false and

illogical on its face. On that same day, Gunawan texted Johnston, Sr. stating, “…. the cascading

effect of this situation has become like being at the edge of ledge.” *See* **Exhibit T.**

64.     On December 5, 2024, Gunawan implored Johnston to make a payment. The

following day, December 6, 2024, Gunawan sent via text, “I have two lending deals. Can we

discuss before noon? Gunawan explains two lending options and Johnston, Sr. specifically

advises Gunawan to take lending option 1. The two options were 1) $10,000.00 with a total

repayment obligation of $13,900.00 with a monthly payment of $1,737.50 or 2) $5,000.00 with a

total repayment obligation of $6,950.00 with a monthly payment of $868.75. Johnston, Sr.,

falsely led Gunawan to believe he would repay this loan and interest. *See* **Exhibit U.**

65.     In a series of texts in December 2024 and January 2025, Gunawan pleaded with

Johnston, Sr. to fulfill his promise and assist with the loan and interest payments. Specifically,

and by way example, “We urgently need a BIG payment, Stephen.” “…What is the timeline on

the payments?" In response, Johnston, Sr. texted, "…We are still waiting for this LOI from the lender." Gunawan issues a text to Johnston, Sr., "Please know that we need a lot more than the LOC payment. I literally, literally, literally, need to keep the lights on…we cannot gamble on timing." Gunawan continues, "Stephen. I am overextended in providing you ample time to resolve the debt. My situation has a limit and we need to resolve this quickly…. Stephen. The situation is URGENT…" Johnston, Sr., in response, states he has no updates. *See* **Exhibit V**.

66.    In January 2025, Gunawan pleaded with Johnston, Sr. to make a LOC payment. He texted him, "My livelihood is seriously at risk. Last week, you mentioned that I could count on you to send me the LOC payment at minimum. Does that commitment still stand? Gunawan continues, "I really need $15,000 today. Stephen, I cannot miss this LOC payment. Can you send the payment?" Johnston replies, "Johan, I am sorry to say I will not be able to send anything today." Upon information and belief, Johnston never intended to send Gunawan any funds. *See* **Exhibit W.**

67.    Gunawan continued to plead with Johnston throughout January and February 2025 but to no avail. Gunawan, in an act of despair, texted Johnston, "…. Tomorrow is Chinese/Lunar New Year. The tradition is to have and be in a positive and mindset…. The lack of payment from you has put my family in a huge mess. You did not even get back to me about the interest payment agreement. This is not cool." Johnston changes course and accuses Gunawan of "Berating" him. *See* **Exhibit X.**

68.    Gunawan sent a text in late February 2025, making the situation clear to Johnston, Sr., "…. you have left me high and dry three times to pay the LOC and have not sent any payment in January 2025. I lost business, and invested a lot of time, money, and good will in

believing that you will sort out the full balance plus interests I have incurred." *See* **Exhibit Y.**

69.    Johnston, Sr., over the next several months, continued in a series of texts to falsely promise and then renege on any payments. This behavior by Johnston, Sr. is followed by months of silence leading into June 2025.

70.    Johnston, Sr. failed to make any payments to Gunawan, and Gunawan, as a result of this fraudulent scheme, was reputationally destroyed with a business now teetering on the verge of bankruptcy.

71.    While Johnston, Sr. was actively making false promises of present fact to pay the loans and interest (along with the Google debt), he, in truth, had no intention, upon information and belief, of ever making any payments to Gunawan or his business. This fraudulent scheme (that was facilitated by Johnston Jr.), who, upon information and belief, was aware of and actively participated with his father, Johnston, Sr. in carrying out these acts of blatant fraud.

72.    To further mitigate the financial disaster that the Johnston Defendants directly caused Plaintiffs, Gunawan, in addition to being fraudulently lured by Johnston, Sr. to take external financing under severe liquidity constraints, as described herein, was forced to sell off his personal investment securities portfolio in an effort to pay suppliers and cover his business operating expenses.

73.    Specifically, Gunawan liquidated his Blackberry and Nokia stock positions totaling $33,405.17, selling off $25,908.59 in May and November of 2024 to pay some of the Google account receivable debt (as the Google crisis was escalating by the day), and thereafter, liquidating $7,496.58 as Gunawan struggled to meet the loan obligations while waiting for the promised assistance by Johnston, Sr. that never occurred and was false to begin with.

19

*See* **Exhibit Z.**

74.    In addition, Gunawan was forced to take personal loans from friends and family to cover his publishers' debt obligations, business expenses and pay the loans. In particular, Gunawan was forced to borrow $30,000.00 from his mentor and friend Benny Radjasa, $12,500.00 from a friend Aric Fedida, $3,000.00 from two other friends, and $6,545.00 from a family member to cover the above referenced debts he was fraudulently induced into securing. These additional borrowings total $51,995.00.

75.    Furthermore, Gunawan was forced to redeem over one million credit card rewards points—accrued over fourteen years of business operations—with a value of $9,566.00.

76.    Despite Gunawan's desperate efforts to mitigate the financial and reputational carnage brought on by the Johnston Defendants; to date he has been unable to satisfy his business obligations and is on the verge of bankruptcy, all of which was directly caused by the Johnston Defendants' fraudulent scheme.

## CLAIMS FOR RELIEF

### First Claim:
### (Breach of Contract against Pubwise)

77.    Paragraphs 1 through 76 are repeated and realleged as if fully set forth herein.

78.    Pubwise violated its contractual duty under the MSA to pay Plaintiffs the accounts receivable owed to Plaintiffs in excess of $232,367.12 in compensatory damages resulting from the breach of the MSA.

79.    Plaintiffs detrimentally relied on the material terms of the MSA in engaging

supply side partners and expanding their own capital to service the supply side partners.

80.     The terms and conditions of the MSA were of material importance to Plaintiffs. Plaintiffs are entitled to compensatory damages as a direct violation of the MSA in an excess of $232,367.12 in compensatory damages.

**Second Claim:**
**(Fraud in the Inducement against Stephen Johnston, Sr. and Stephen Johnston, Jr.)**

81.     Paragraphs 1 through 80 are repeated and realleged as if fully set forth herein.

82.     The Johnston Defendants were not parties to the MSA. The MSA was signed by the Pubwise Chief Revenue Officer.

83.     Plaintiffs allege multiple material misrepresentations of present fact that are independent and collateral to the MSA, including the Johnston Defendants willfully and maliciously luring Gunawan to take out substantial high-interest loans and knowingly and willfully making multiple material false promises to assist with the loan and interest payments that Gunawan and the Arbigo Group Companies were forced to secure to pay their supply partners and business expenses.

84.     The material and willfully false statements and misrepresentations made by Johnston, Sr. for almost a two-year period were carried out by him (with the assistance, knowledge and encouragement of Johnston, Jr.) to fraudulently induce Gunawan and the Arbigo Group Companies to continue operating under false pretenses of imminent payment, ultimately forcing Gunawan to sustain the business by obtaining financing from ODK Capital, LLC in the amount of $100,000 at an annual interest rate of 49.94%. Johnston, Sr. and Gunawan expressly understood that this loan would be temporary until Pubwise paid its outstanding obligations.

21

When Pubwise failed to pay, Gunawan was forced to refinance through TD Bank, obtaining a $100,000 loan and $50,000 line of credit. The total debt incurred as a result of Johnston, Sr.'s fraudulent inducement, exceeded $150,000 plus substantial interest.

85.    Gunawan justifiably relied on Johnston, Sr.'s numerous material and false promises to pay the loans and high interest rates.

86.    The fraudulent scheme described above also forced Gunawan to borrow $51,995.00 from family and friends and to liquidate over one million credit card rewards points accrued over fourteen years of business operations—with a value of $9,566.00.

87.    The false statements and material misrepresentations made by Johnston, Sr. for almost a two-year period were carried out by him (with the assistance, knowledge and encouragement of Johnston, Jr.) directly caused Gunawan and the Arbigo Group Companies to lose the LoopMe (and have a suspension imposed by Google) supply side relationships.

88.    The false statements and material misrepresentations made by Johnston, Sr. for almost a two-year period that were carried out by him (with the assistance, knowledge and encouragement of Johnston, Jr.) directly caused Gunawan and the Arbigo Group Companies to suffer damages. These acts were willful and malicious and caused Gunawan to lose his business and professional reputation in the ad tech industry and further led the Arbigo Group Companies into severe debt and to the verge of bankruptcy.

89.    Johnston, Sr., by his own admission, is a highly seasoned and successful businessman, as his background on the Pubwise management section describes stating in relevant part that, "Stephen brings to Pubwise a depth of experience in operations, mergers, and acquisitions with multiple successful exits in his career. Stephen formed Clear Communications

Group in 1990 and was a pioneer in the cellular telephone industry owning, building and operating cellular telephone markets. Clear rebranded in 1999 as o2wireless while Stephen as Chairman and CEO managed the acquisition of more than 35 companies to form a leading provider of integrated network solutions to the global wireless telecommunications industry. Stephen took the company public in 2000 with over 700 employees and $150M in annual revenue…"

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

1. On the First Claim: $232,367.12 in compensatory damages, representing unpaid accounts receivable owed under the MSA, together with prejudgment and post-judgment interest, cost and such other relief as the Court deems just and proper.

2. On the Second Claim, a money judgement is to be determined at trial but in any event no less than $150,000 in bank loans and interests in excess of $98,044.07 accrued to date during the relevant period in question, $51,995.00 in personal loans, stock sales totaling $33,405.17, and $9,566.00 in redeemed credit card rewards, together with punitive damages in an amount to be determined at trial.

3.  Plaintiffs request attorney's fees and Court costs.

Dated: New York, New York                SilverLine Collective, LLC
       February 6, 2026                  McMenamin Law Group dba

                                         By: S/ Paul R. McMenamin
                                       Paul R. McMenamin [PM 0180]
                                       1140 Avenue of the Americas, 9th Floor
                                       New York, NY 10036
                                       (917) 312-8334
                                       paul@silverlinecollective.com

                                       *Attorneys for plaintiffs*

## VERIFICATION

STATE OF PENNSYLVANIA          }
                               } ss:
COUNTY OF PHILADELPHIA         }

I, Johan Gunawan, the named Plaintiff in this matter and the sole owner of Arbigo Inc, and Supernova, Inc, and MSymmetry (a d/b/a of Supernova Inc.), being duly sworn attest under penalty of perjury that I have read the foregoing verified complaint, know its contents, and that the same is true based on my personal knowledge of the facts, except to those matters stated upon information and belief, and as to those matters believe them to be true,

_____

Sworn to before me
On this 29th day of January 2026,

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
David A. Wyszynski, Notary Public
Philadelphia County
My Commission Expires February 24, 2029
Commission Number 1305845